UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

ALVIN J. WATSON, <u>et al.</u>,

    Plaintiffs,

v.

EATON ELECTRICAL INC., <u>et al.</u>,

    Defendants.

Case No. 2:06-CV-00277-KJD-GWF

**ORDER**

    Currently before the Court is Defendants Eaton Electrical Inc. and Eaton Corporation's, [hereinafter referred to jointly as "Eaton" or "Defendants"] Motion for Summary Judgment (#30, 31) filed October 15, 2007. Plaintiffs Alvin Watson [Watson] and Power Management Controls, Inc. [Power Management] [hereinafter referred to jointly as "Plaintiffs"] filed an Opposition (#35) on November 2, 2007, to which Eaton filed a Reply (#40) on November 30, 2007. Also before the Court is Plaintiffs' Motion for Summary Judgment (#32) filed October 15, 2007. Defendants filed an Opposition (#34) on November 2, 2007, to which Plaintiffs filed a Reply (#38) on November 30, 2007.[1]

---

[1] Because both Motions for Summary Judgment involve related issues and arguments, the Court addresses both Motions jointly herein.

**I. Background**

In 2001, Eaton, a leading provider of electrical drive solutions, and Watson, an engineer and innovator with extensive experience in the oil and gas industry, entered into a License Agreement and Manufacturer's Representative Agreement [collectively referred to as "Agreements"] to develop and market a drive application that was specific to the oil and gas industry. The application was designed to make a beam pump run more efficiently. The collaboration yielded a drive product called the BP9000.[2] Under the Agreements, among other things, Watson granted to Defendants an exclusive license under Watson's Licensed Patents to manufacture, use, and sell drives he had invented for alternating current motors for driving a cylindrical load, as well as an exclusive license to utilize Watson's Know-How and Technical Information, and Software developed, owned, or controlled by Watson for controlling alternating current motors for driving cylindrical loads. (License Agreement at 1–2.)   The Agreements required Defendants to pay Watson a fee of $17,500 in expenses for transferring his Know-How and Technical Information upon execution of the agreement, and another $17,500 upon completion of the transfer of Watson's Know-How and Technical Information. Additionally, the Agreements provided that Defendants were to provide Watson with a royalty of five percent (5%) of the net selling price for all BP9000's sold. (Id.) The term of the agreement was three years from the date it was entered into, with an automatic renewal from year to year thereafter. (Id. at 4.)

The relationship between the parties deteriorated when Watson alleged that Eaton had failed to compensate him as required under the Agreements, and in April 2003, Watson sued Eaton. In December 2003, the parties entered into a Settlement Agreement with the intent to end the underlying lawsuit and terminate the underlying Agreements. Under the Settlement Agreement, Defendants agreed to pay Plaintiff Sixty Thousand Dollars ($60,000) on or before January 10, 2004,

---

[2] Eaton sells a number of Variable Frequency Drive (VFD) products, including its BP-based products which are marketed for the oil field. (Plaintiffs' Mot. for Summ. J. at 2.) Specifically, Watson's collaboration with Eaton resulted in the creation of the BP9000 drive, an adjustable frequency drive for a beam pump that added functionality to the SV9000 drive Eaton was already selling, and which had been on the market since 1999. (Defendants' Opposition at 7–8.)

and a royalty of 5% of the net selling price of all products sold by Eaton that incorporated the software described in the agreement, from December 10, 2003, through December 9, 2005, and a royalty of 3-1/2% for the period of December 10, 2005, to December 9, 2008.

Watson filed the current action in state court on January 31, 2006, alleging six claims for relief, including (1) Breach of Contract; (2) Breach of Implied Covenant of Good Faith and Fair Dealing; (3) Fraudulent Misrepresentation; (4) Negligent Misrepresentation; (5) Declaratory Relief, and; (6) Injunctive Relief. Watson's Complaint, together with both Motions for Summary Judgment, detail an obvious discrepancy between the parties regarding the interpretation of the Settlement Agreement. Specifically, the parties disagree regarding the number of products Eaton produces, upon which it owes Watson royalty payments. Specifically, Watson claims that Eaton owes him royalty payments for "all products sold with software having the capability for controlling an alternating motor for driving a cyclical load." (Pls.' Mot. at 2.) Eaton, in opposition contends, that it is only required to pay Watson a royalty on the BP-based products to which Watson contributed, or which were derivatives of the products Watson helped Eaton develop. (Defs.' Mot. for Summ. J.)

Plaintiffs seek that the Court grant their Motion for Summary Judgment by finding the Settlement Agreement is not ambiguous, and that Defendants have breached the Agreement by failing to pay Plaintiffs royalty payments and interest in the amount of approximately $6,131,156.63. Defendants likewise contend that the Settlement Agreement is not ambiguous, and seek that the Court grant summary judgment in their favor by finding them in compliance with the terms of the Agreement, and thus dismiss all of Plaintiffs' claims, because they arise from his breach of contract allegations.[3]

---

[3] Defendants additionally seek that Plaintiffs' claims for fraudulent misrepresentation and negligent misrepresentation must fail because, assuming *arguendo* that Eaton failed to fulfill its obligations under the Settlement Agreement, evidence of nonperformance alone is insufficient. (See Defs.' Mot. For Summ. J. at 18–19.)

3

**II.  Standard for Summary Judgment**

Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at 323.  The burden then shifts to the nonmoving party to set forth specific facts demonstrating a genuine factual issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(e).

All justifiable inferences must be viewed in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587.  However, the non-moving party may not rest upon the mere allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit or other evidentiary materials provided by Rule 56(e), showing there is a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  The court need only resolve factual issues of controversy in favor of the non-moving party where the facts specifically averred by that party contradict facts specifically averred by the movant.  See Lujan v. Nat'l Wildlife Fed'n., 497 U.S. 871, 888 (1990); see also Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995) (stating that conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment).  "[U]ncorroborated and self-serving testimony," without more, will not create a "genuine issue" of material fact precluding summary judgment.  Villiarimo v. Aloha Island Air Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).

Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Summary judgment shall not be granted if a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 248.

**III. Analysis**

When examining or interpreting a contract, the court's goal is to give effect to the parties' mutual intentions. See Crockett & Meyers, Ltd. v. Napier, Fitzgerald & Kirby, LLP., 440 F.Supp. 2d 1184, 1193 (D. Nev. 2004). "The question of the interpretation of a contract when the facts are not in dispute is a question of law," to be decided by the court. Shelton v. Shelton, 78 P.3d 507, 510 (D. Nev. 2003). In interpreting a contract, the Court must determine whether the parties' agreement is ambiguous. Red Rock Communications, Inc. v. American Telecasting, Inc., 2006 WL 254195 (D. Nev. 2006). The express language of a contract is considered ambiguous "if it is reasonably susceptible to more than one interpretation." Shelton, 78 P.3d at 510. If the Court finds that a contract's terms "are reasonably susceptible to more than one interpretation, extrinsic evidence is admissible to determine the parties' true intent." Red Rock Communications, Inc., 2006 WL 254195 at *5. Determining the parties' true intent or the circumstances that may elucidate ambiguous language may require fact finding by the trier of fact. Id. "[W]hen interpreting a contract, 'a court may consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct[ .]'" Id. (Quoting Taylor v. State Farm Mut. Auto. Ins. Co., 854 P.2d 1134, 1139 (Ariz.1993)). If a party presents the court with extrinsic evidence to support their argument regarding the meaning of contractual language, the court must first consider the offered evidence that allegedly "illuminate[s] the meaning of the contract language, or demonstrate[s] the parties' intent," and determine whether the proffered evidence has any probative value in determining the parties' intent. Id. (citing 3 Corbin § 542, at 100-01 (1992 Supp.)). Under this premise, the court then may interpret the contract subject to the parol evidence rule's preclusion of extrinsic evidence that would vary or contradict the meaning of the contract's express terms. Rock Communications, Inc., 2006 WL 254195 at *5. "The court should enforce a contract as it was written, should not create a new contract by rewriting unambiguous terms, and has no power to create a new contract." Court. Ins. Co. of N. Am. v. Hilton Hotels U.S.A., Inc., 908 F.Supp. 809, 814 (D. Nev. 1995).

**A. The Settlement Agreement**

Both parties have submitted extrinsic evidence in support of their respective positions regarding their intent in entering into the Settlement Agreement. The Court has considered this evidence for its probative value, and begins its discussion here with the Agreement's express language.[4]

While the Court examines the Agreement as a whole, it particularly examines sections 4.02 and 3.01, as they are the sections disputed by the parties.[5] Specifically, Plaintiff contends that Eaton has breached section 4.02 of the Settlement Agreement by refusing to pay him royalty percentages on all drives Eaton has manufactured and sold during the relevant time period that contain software capable of controlling an alternating motor for driving a cyclical load. Eaton maintains however, that the Settlement Agreement only requires that Plaintiff be paid a royalty percentage for products that incorporated the software that Watson aided in developing.

Paragraph 4.02 of the Settlement Agreement, entitled PAYMENT, states:

> 4.02 For the period December 10, 2003, through December 9, 2005, EATON shall pay PMCI a royalty of 5% of the Net Selling Price as defined in the License Agreement of all products sold by EATON incorporating in any manner the Software or software as described in Paragraph 3.01 hereinabove. For the period December 10, 2005, to December 9, 2008, EATON shall pay PMCI a royalty of 3-1/2% of the Net Selling Price as defined in the previous sentence.

(Settlement Agreement at 5.)

Paragraph 3.01 of the Settlement Agreement, entitled RIGHTS NOTWITHSTANDING TERMINATION describes the applicable software as follows:

> 3.01 Notwithstanding the termination of the Licensing Agreement effected by Paragraph 1.01 hereinabove, both parties shall be entitled to continue to manufacture, licence, use, sell, modify and make derivative works of the Software and the software

---

[4] The extrinsic evidence provided to the Court by the parties includes *inter alia* the underlying License and Manufacturer's Representative Agreements, and the deposition testimony of Marvin L. Union, Esquire, Thomas M. Doring, Steven Weston, Robert A. Fenton, and Alvin J. Watson.

[5] "The court must read the contract as a whole and interpret every part with reference to the whole." Turner v. U.S., 875 F.Supp. 1430, 1434 (D. Nev. 1995).

6

> each had in their respective possession as of December 10, 2003, for use in drives for controlling an alternating current motor for driving a cylindrical load, as well as software called "pump off software", as it existed on December 10, 2003, and both parties agree to not assert any intellectual property rights against the other relating to the Software or the software in their possession as on December 10, 2003.

(Settlement Agreement at 5.)

The Settlement Agreement states that "[a]ny terms defined in the License Agreement shall continue to have the same meaning when used in this Agreement." (Settlement Agreement at 1.) Thus, the Court looks to the License Agreement to determine the definition of certain key terms contained in the Settlement Agreement. Among other things, the Court finds the License Agreement definition of the term "Software" illuminating to its ambiguity analysis. The license agreement defines "Software" as:

> "Software" as used herein shall means (sic) all software developed, owned or controlled by WATSON during the term of this Agreement for use in controlling an AC motor for driving a cylindrical load including object code, source code, electronic flowcharts, and documentation.

(License Agreement at 2.)

Notably, while the License Agreement contains a definition of the uppercase term "Software" meaning "all software developed, owned, or controlled" by Watson for "use in controlling an AC motor for driving a cylindrical load", the License Agreement contains no definition in reference to lowercase "software." A plain reading of the Settlement Agreement language suggests that the lowercase term is intended a meaning separate and apart from the uppercase term, it is difficult to discern with certainty however, the parties' actual intent as to the term's meaning.

Both parties set forth differing interpretations regarding the meaning of the lowercase term "software," some of which the Court finds plausible, but none of which are sufficiently supported by either the plain language of the Agreement, or the extrinsic evidence, sufficiently so as to render the term unambiguous. Plaintiffs contend that a plain reading of section 3.01 suggests that the lowercase term refers to all software Eaton sold for use in drives for controlling an alternating current motor for

driving a cylindrical load regardless of Watson's involvement in the development of such. Defendants, in opposition, contend that the term references only "beam pump" software.

The Court finds additional ambiguity regarding the lowercase term "software" as found in Section 3.01, as the definition of "Net Selling Price" in the License Agreement, referenced in Section 4.02 is defined as "the invoice price charged by [Eaton] for the BP9000 less freight, taxes, custom duties, insurance and returns." (License Agreement at 4.) Notably, this definition limits the products upon which Eaton was required to pay to BP-based products only, which were developed with Watson's collaboration.[6] This language directly contradicts Plaintiffs' contention that Eaton owes Watson royalty payments on all drives that contain software capable of controlling an alternating motor for driving a cyclical load, and not just the BP9000 line and its derivatives.

The Settlement Agreement is ambiguous in regard to the products upon which Defendant is required to pay Plaintiff royalties. Particularly, the Court finds that the inclusion of the terms "Software, and the software each had their respective possession as of December 10, 2003, for use in drives for controlling an alternating current motor for driving a cylindrical load" and the additional provision "as well as software called 'pump off software'" creates an ambiguity as to what is intended by the lowercase term "software."

Due to the ambiguity, the Settlement Agreement is susceptible to various interpretations, and therefore the Court must look beyond the express language of the Agreement to determine the true intent of the parties. Here however, the extrinsic evidence submitted by the parties, though probative, does not sufficiently illuminate the meaning of the contract language or demonstrate the parties' intent to the degree that the Court is able to determine the precise meaning of the Settlement Agreement or the intent of the parties' upon entering into it. The majority of extrinsic evidence referred to in the parties' motions are excerpts of deposition testimony taken well after the contract was entered into, and which lay out each party's arguments, respectively. It is not for the Court to

---

[6] The License Agreement states that BP9000 "shall mean an adjustable frequency drive for a beam pump which is a SV9000 drive sold by CH which includes the Software." (License Agreement at 2.)

8

weigh the testimonies of these parties in an attempt to determine whose depiction is more accurate or truthful.  The question of intent, in light of the parties' competing interpretations of the Settlement Agreement is a factual issue that must be resolved by a jury.  See <u>Economy Forms Corp. v. The Law Company, Inc.</u>, 593 F.Supp. 539 (D. Nev. 1984).  Therefore, the Court finds that summary judgment is improper at this time, and hereby denies both parties' Motions for Summary Judgment.

**IV. Conclusion**

      **IT IS HEREBY ORDERED THAT** Defendants' Motion for Summary Judgment (#30, 31) is **DENIED**.

      **IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (#32) is **DENIED**.

      DATED this 29th day of September 2008.

_____
Kent J. Dawson
United States District Judge