# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

ALVIN J. WATSON, et al.,

    Plaintiffs,

v.

EATON ELECTRICAL INC., et al.,

    Defendants.

Case No. 2:06-CV-00277-KJD-GWF

**ORDER**

Currently before the Court is Plaintiffs' Motion for New Trial (#118). Defendants filed a Response in Opposition (#122), to which Plaintiffs filed a Reply (#123). Also pending before the Court is Defendants' Motion for Attorney Fees (#115). Plaintiffs filed a Response in Opposition (#121), to which Defendants filed a Reply (#123). The Court has considered both Motions, their respective Responses and Replies, and issues its ruling on both Motions together herein.

**I.  Background**

In 2001, Eaton, a leading provider of electrical drive solutions, and Watson, an engineer and innovator with extensive experience in the oil and gas industry, entered into a License Agreement and Manufacturer's Representative Agreement [collectively referred to as "Agreements"] to develop and market a drive application that was specific to the oil and gas industry. The application was designed to make a beam pump run more efficiently. The collaboration yielded a drive product

called the BP9000.  Under the Agreements, among other things, Watson granted to Defendants an exclusive license under Watson's Licensed Patents to manufacture, use, and sell drives he had invented for alternating current motors for driving a cylindrical load, as well as an exclusive license to utilize Watson's Know-How and Technical Information, and Software developed, owned, or controlled by Watson for controlling alternating current motors for driving cylindrical loads. (License Agreement at 1–2.)  The Agreements required Defendants to pay Watson a fee of $17,500 in expenses for transferring his Know-How and Technical Information upon execution of the agreement, and another $17,500 upon completion of the transfer of Watson's Know-How and Technical Information.  Additionally, the Agreements provided that Defendants were to provide Watson with a royalty of five percent (5%) of the net selling price for all BP9000's sold.  (Id.)  The term of the agreement was three years from the date it was entered into, with an automatic renewal from year to year thereafter. (Id. at 4.)  The relationship between the parties deteriorated when Watson alleged that Eaton had failed to compensate him as required under the Agreements, and in April 2003, Watson sued Eaton.  In December 2003, the parties entered into a Settlement Agreement with the intent to end the underlying lawsuit and terminate the underlying Agreements.  Under the Settlement Agreement, Defendants agreed to pay Plaintiff Sixty Thousand Dollars ($60,000) on or before January 10, 2004, and a royalty of 5% of the net selling price of all products sold by Eaton that incorporated the software described in the agreement, from December 10, 2003, through December 9, 2005, and a royalty of 3-1/2% for the period of December 10, 2005, to December 9, 2008.

Watson filed the current action in state court on January 31, 2006, alleging six claims for relief, including: (1) Breach of Contract; (2) Breach of Implied Covenant of Good Faith and Fair Dealing; (3) Fraudulent Misrepresentation; (4) Negligent Misrepresentation; (5) Declaratory Relief, and; (6) Injunctive Relief.  Watson's Complaint, details a discrepancy between the parties' interpretation of the Settlement Agreement.  Specifically, the parties disagreed regarding the number of products Eaton produces, upon which it owed Watson royalty payments.   Specifically, Watson

claimed that Eaton owed him royalty payments for "all products sold with software having the capability for controlling an alternating motor for driving a cyclical load." (Pls.' Mot. at 2.) Eaton, in opposition contended, that it was only required to pay Watson a royalty on the BP-based products to which Watson contributed, or which were derivatives of the products Watson helped Eaton develop. (Defs.' Mot. for Summ. J.)

Trial in this case commenced on November 5, 2009, and on November 13, 2009, the jury returned a verdict for the Defendants. Judgment was entered on November 17, 2009. Now, Plaintiffs seek that the Court grant a new trial pursuant to Fed. R. Civ. P. 59, "based upon the failure of the jury foreperson to make full disclosure during voir dire, the Court's inclusion of [a jury instruction for] the laches defense, and inclusion of [information regarding] prior lawsuits at trial". (#118 at 1.)

**II. Analysis**

   **A. Motion for New Trial**

Plaintiffs seek that the Court grant a new trial pursuant to Fed. R. Civ. P. 59, which provides that "the Court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows . . . after jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). As evidenced by its text, "Rule 59 does not specify the grounds on which a motion for a new trial may be granted. Rather, the court is bound by those grounds that have been historically recognized. Historically recognized grounds include, but are not limited to, claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (citations and internal quotation marks omitted).

   *1. Voir Dire*

Plaintiffs aver that several "substantial errors" occurred during the trial of this matter that warrant a new trial. First, Plaintiffs contend that the jury foreperson failed to disclose key information about her background which impacted her decision in this matter. Specifically, Plaintiffs

allege that Juror No. 5 failed to fully respond to voir dire questions regarding her husband's employment in the area of software development, and about her educational background. After the verdict was returned, counsel for Plaintiffs polled a number of jurors, wherein juror No. 5 indicated that because her husband is a software engineer for the United States Air Force, she had a significant amount of insight as to what software development entails. Additionally, Plaintiffs note that Juror No. 5 also failed to indicate that she was a psychology major, which allowed her to understand the "psychological aspects" of the "tactics" Plaintiffs' counsel used in the case. (See #118 at 4.)

When a motion for a new trial is made based upon allegations that a juror failed to fully disclose information during voir dire, the moving party must demonstrate that (1) a juror failed to answer a material question honestly; and (2) that a correct answer would have provided a valid basis for a challenge "for cause". Price v. Kramer, 200 F.3d 1237, 1254 (9th Cir. 2000)(citing McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556 (1984). Defendants argue that Plaintiffs have failed to demonstrate either.

The record shows that during voir dire, and as proposed by the Defendants' submitted voir dire questions (#83), the Court questioned the jury panel as to whether, any of them had, or whether members of their immediate family had been involved in software development and licensing. One prospective juror (not juror No. 5) answered affirmatively that his son worked as a software developer for a company in California. The Court asked the prospective juror if that relationship would interfere with his ability to judge the case based solely upon the evidence presented, to which the prospective juror responded, "no." Said prospective juror was not dismissed for cause. Subsequently however, he was dismissed during the peremptory challenge phase. Juror No. 5 did not raise her hand or indicate an affirmative response to the question posed. Subsequently, when the prospective jurors were asked to answer a set of standard background and informational questions, Juror No. 5 stated that her husband was on active duty in the Air Force, and that she had graduated from high school, and attended some college, but hadn't attained a degree. No follow-up questions were asked regarding employment of spouse or educational courses.

1    Plaintiffs' assertion that Juror No. 5's knowledge regarding software code and development
2 was a critical consideration in its voir dire selection is contravened by the fact that none of Plaintiffs'
3 proposed voir dire questions address knowledge of software or software code.  (See # 87.) Moreover,
4 no challenge for cause was made by either party when one potential juror disclosed that a member of
5 his immediate family was a software developer.  Numerous times during voir dire the Court inquired
6 regarding the prospective jurors' ability to judge the case based solely on the evidence presented.
7 None of the individuals selected for the ultimate jury panel in this action presented any indication to
8 the contrary.  Even if Juror No. 5 had been asked to elaborate regarding her husband's background as
9 a software engineer, the Court does not find that such information could support a valid basis for a
10 challenge for cause.  There is no evidence to suggest that the background of Juror No. 5's husband in
11 software engineering, proffers any bias on Juror No. 5's part against Plaintiffs.  Nor is there any
12 allegation that she discussed the case with her husband in reaching her verdict.  Defendants'
13 argument is additionally buttressed by the fact that none of the prospective jurors were asked to
14 elaborate regarding college course work.  Plaintiffs argument that Juror No. 5's understanding of
15 psychology somehow created bias towards the Plaintiffs is completely absurd.
16    Accordingly, the Court finds that Juror No. 5's failure to disclose that her husband is a
17 software engineer, or that she had taken college courses in psychology does not provide a valid basis
18 for a challenge for cause.
19    *2. Laches*
20    Plaintiffs also aver that the Court committed substantial error by instructing the jury
21 regarding the defense of laches.  Specifically, Plaintiffs aver that the jury instruction given was
22 erroneous and inapplicable to the evidence of this case.  The Nevada Supreme Court has defined
23 laches as a doctrine in equity which may be invoked "when delay by one party works to the
24 disadvantage of the other, causing a change of circumstances which would make the grant of relief to
25 the delaying party inequitable."  Building and Const. Trade Council of N. Nev. v. State ex rel. Public
26

Works, 836 P.2d 633, 636–37 (Nev. 1992)(citing Erickson v. One Thirty-Three, Inc., 766 P.2d 898 (Nev. 1988).

Plaintiffs state that Defendants did not meet their burden of proving the defense of laches by a preponderance of the evidence, and further, that because Watson testified that he did not know that he was not being completely compensated under the settlement agreement he could not have taken any affirmative steps upon which Eaton may have relied to its detriment. (See #118 at 5.) Additionally, Plaintiffs argue that Defendants failed to establish any detriment or change in circumstances that could support a laches defense.

Jury Instruction No. 22 regarding laches, stated:

> Eaton has asserted the affirmative defense of laches as to Plaintiffs' claim. A defense of laches is founded on the principle that a long delay in asserting a right may be grounds to prevent a party from asserting a claim. The defense of laches is proved if Eaton shows strong circumstances exist that demonstrate the delay on the part of the Plaintiffs disadvantaged the defendant, causing a change in circumstances which makes the grant of the Plaintiffs' claim unjust.

(#118 Ex. 2.)

The Court's instruction regarding laches was appropriate. While it is reversible error for a court to instruct a jury regarding claims or defenses not supported by the evidence, such is not the case here. See Allan v. Levy, 846 P.2d 274, 274–76 (Nev. 1993); Village Development Co. v. Filice, 526 P.2d 83, 87–88 (Nev. 1974). At trial, Defendants presented evidence demonstrating that Watson waited approximately eighteen months before asserting that Eaton was not paying him all of the royalties he was allegedly due under the settlement agreement. The evidence showed that during those eighteen months, Watson made no objection to the size of the royalty payment he was receiving. Moreover, Defendants presented evidence that the settlement agreement was intended to define the "metes and bounds" of Plaintiffs' rights so that Eaton could continue with the development and marketing of its products without fear of being sued again by Watson. Eaton alleges that for eighteen months it proceeded under this understanding and acted in reliance on Watson's failure to seek additional royalty payments as a demonstration that Watson was satisfied

6

with Eaton's interpretation of the agreement.  As stated above, Watson now argues that his "own testimony was that he did not know he was not being completely compensated in compliance with the [s]ettlement [a]greement and therefore could not have taken any affirmative steps upon which Eaton relied to its detriment." (#124 n. 1.)  The Court finds that Plaintiffs' position regarding the laches instruction is, at most, conflicting.  Accordingly, Plaintiff has failed to demonstrate that the laches instruction caused prejudice, or constitutes substantial error.

### 3. Other Litigation

Additionally, Plaintiffs claim that the Court committed substantial error by allowing Defendants to introduce evidence of other litigation which had the effect of painting Plaintiff as a "perpetual litigator" (see #118 at 5), and that such evidence was "irrelevant, improper, and highly prejudicial." (#18 at 7.)

Plaintiffs filed a Motion in Limine (#67) prior to trial, arguing that evidence of other litigation would be prejudicial.  In opposition, Defendants argued that evidence of other litigation was necessary for the purpose of demonstrating that SPOC Automation sought certain software from Defendants and in support of their laches defense.  (See #75.)  Here, Plaintiffs allege that evidence of any other litigation was not relevant to the issue of whether Defendants may have been liable for breach of the underlying settlement agreement.  Additionally, Plaintiffs argue that evidence regarding previous litigation should have been precluded pursuant to Federal Rule of Evidence 404, which prevents admission of evidence that is proffered to demonstrate that a party acted in conformity with character on a separate, particular occasion.

The Court finds that the evidence presented by Defendants at trial was probative to an understanding of the facts that gave rise to the settlement agreement, which was a central issue in this action.  Additionally, in relation to Watson's prior suit with SPOC Automation, the subject matter of that lawsuit related to the beam pump software that Watson allegedly provided to SPOC Automation for installation on Eaton drives, and was germane to Watson's claim that the software was already included on Eaton's drives.  Moreover, and as stated in the previous filings related to Plaintiffs'

Motion in Limine, the SPOC Automation lawsuit was relevant to the instant action because resultant of said litigation, SPOC Automation sought beam pump software from Eaton, allegedly disproving Plaintiffs' claim that the software was already incorporated into Eaton's drives. As stated in its Order of October 26, 2009, in which the Court denied Plaintiffs' attempt to preclude evidence regarding other litigation because said litigation was central to this action, Defendants claimed "Watson was selling cylindrical load or beam pump software to SPOC and SPOC was incorporating that . . . software into Eaton standard drives, thus belying Watson's claim that those drives already contain such software." (#79 at 2.)

Accordingly, the Court's allowance of evidence regarding other litigation did not cause undue prejudice, violate Federal Rule of Evidence 404, or constitute substantial error.

*4. Material Breach Comment*

Finally, Plaintiffs aver that the Court committed substantial error by failing to address Plaintiffs' objection to Defendants' use of the term "material" breach of contract in their closing argument. Particularly, Plaintiffs allege that Defendants' use of the word "material" in a Powerpoint slide during its closing argument, in spite of the Court's ruling against inclusion of a jury instruction for "material breach", constitutes a substantial error. The Court disagrees.

Although one slide of Defendants' PowerPoint presentation used the term "material breach" in conjunction with the elements of a breach of contract claim, the record demonstrates that the Defendants' attorney articulated the elements of breach of contract as set forth in the Court's final jury instructions and without reference to the word "material." Additionally, the only claim of breach in this case was Watson's claim that Eaton failed to pay him over $8 million in royalty payments. Thus, the Court finds that even if any juror may have been confused by the term "material" on the Powerpoint slide, (which has not been evidenced) such error would have been harmless as it could have no bearing on the jury's deliberations. Additionally, the Powerpoint slide was not given to the jury, no attention was called to the term by any attorney, and the Jury Instructions did not make reference to the term.

1  Accordingly, the Court finds that no substantial error was committed that could merit a new
2  trial under Rule 59.

### B. Attorney Fees

Defendants seek that the Court grant them attorney fees in the amount of $422.708.25 pursuant to N.R.S. § 18.010, Fed. R. Civ. P. 54(d), and LR 54-16.

N.R.S. § 18.010 provides in pertinent part:

> (b) Without regard to the recovery sought, when the court finds that the claim, counterclaim, cross-claim or third-party complaint or defense of the opposing party was brought or maintained without reasonable ground or to harass the prevailing party. The court shall liberally construe the provisions of this paragraph in favor of awarding attorney's fees in all appropriate situations. It is the intent of the Legislature that the court award attorney's fees pursuant to this paragraph and impose sanctions pursuant to Rule 11 of the Nevada Rules of Civil Procedure in all appropriate situations to punish for and deter frivolous or vexatious claims and defenses because such claims and defenses overburden limited judicial resources, hinder the timely resolution of meritorious claims and increase the costs of engaging in business and providing professional services to the public.

For purposes of NRS § 18.010(2)(b), a claim is frivolous or groundless if there is no credible evidence to support it. Semenza v. Caughlin Crafted Homes, 901 P.2d 684, 687 (Nev. 1995); Allianz Ins. Co. v. Gagnon, 860 P.2d 720, 724 (Nev. 1993). Defendants contend that they should be awarded attorney fees under section 18.010 based, in part, upon the fact that the Court granted their Motion for Judgment as a Matter of Law (#95) pursuant to Fed. R. Civ. P. 50(a) in regards to Plaintiffs' claims for claims for breach of implied covenant of good faith and fair dealing, fraudulent misrepresentation, and negligent misrepresentation. (See #98.)  The Court also held that no reasonable jury could find that Defendants acted with express or implied malice or oppression that would entitle Plaintiffs to an award of punitive damages.[1]  (Id.)

Under NRS § 18.010(2)(b), the Court considers whether the claims pursued by the losing party against the prevailing party were based on reasonable grounds. Here, as stated in its previous

---

[1] The Court reserved judgment on Defendants' Rule 50(a) Motion with regard to Plaintiffs' breach of contact claim.

Order (#42) denying Defendants' Motion for Summary Judgment the Court concludes that Plaintiffs' breach of contract claim was based on a portion of the underlying settlement agreement that was ambiguous, and susceptible to various interpretations" which was appropriately resolved by the jury. (Id. at 8)( See Shelton v. Shelton, 78 P.3d 507, 510 (D. Nev. 2003) (holding that the express language of a contract is considered ambiguous "if it is reasonably susceptible to more than one interpretation).

Throughout the entire litigation of this case, Watson maintained his position that in order to comply with the settlement agreement, Eaton was to pay him royalties on every drive it sells, or, more correctly, that all of Eaton's drives incorporate the "Software or software" as defined in the settlement agreement. At trial however, and as reflected by the jury's verdict, Watson was unable to provide any evidence to support his interpretation of the settlement agreement.

In its Order denying summary judgment (#42), the Court indicated that additional evidence was necessary to ascertain what the parties intended by inclusion of the phrase "software" with a lowercase "s" in the settlement agreement. At trial, the uncontroverted evidence demonstrated that the use of the lowercase term "software" in the phrase "Software and software" was intended to capture the fact that Eaton contributed to the development of the beam pump software application, and that a functional definition rather than product identifier was used to avoid conflict over a product name change. Plaintiffs failed to demonstrate any facts from which a reasonable jury could reach a contrary determination. Mr. Watson's testimony regarding his interpretation of the settlement agreement was directly contradicted by virtually every piece of evidence admitted for the issue of contract interpretation.

Accordingly, the Court finds that Plaintiffs' claims were not groundless. There was argument to support Watson's interpretation of the settlement agreement. Accordingly, the Court finds that Defendants should not be awarded attorney fees pursuant to N.R.S. § 18.010.

### III. Conclusion

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for New Trial (#118) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Attorney Fees (#115) is **DENIED**.

DATED this 20th day of September, 2010.

_____
Kent J. Dawson
United States District Judge